[L. A. No. 2647. Department Two—January 25, 1912.]

# FIRST NATIONAL BANK OF MONROVIA (a Corporation), Respondent, v. MARYLAND CASUALTY COMPANY (a Corporation), Appellant.

BURGLARY INSURANCE—ENTRY EFFECTED BY MEANS OF TOOLS OR EXPLOSIVES USED DIRECTLY UPON SAFES—ENTRY BY USE OF COMBINATION OF SAFE—CONSTRUCTION OF POLICY.—Under a policy insuring a bank against loss by burglary, which limited the liability of the insurer to a loss by burglary accomplished through entry into the bank's safes "by the use of tools or explosives directly thereupon," or, in the event that the property stolen was taken from an inner chest contained in a safe, to a loss accomplished through entry into such chest also "by the use of tools or explosives directly thereupon," the insurance company is not liable for a loss by burglary of property taken from such inner chest, where entry thereto was effected by the use of the secret combination of its locks, a knowledge of which had been surreptitiously acquired by the burglars while making repairs on the safe, notwithstanding entry into the outer safe was made by the use of tools directly upon that safe.

ID.—PLEADING—SUFFICIENCY OF COMPLAINT—ABSENCE OF DEMURRER.— In an action to recover for a loss of property abstracted by the burglars from such an inner chest, the complaint, after trial and in the absence of a special demurrer, will be held sufficient to state a cause of action, notwithstanding it avers an entry into the "safes," instead of an entry into the safe and chest.

ID.—EVIDENCE—FINDINGS NOT SUSTAINED.—In this case it is held, upon a review of the evidence, that the findings that the safes mentioned in the policies were entered by the use of tools directly thereupon are not sustained, because the evidence shows without conflict that entry into the inner steel burglar proof chest from which the valuables were extracted was not effected by the use of tools directly thereupon, but solely by the use and operation of the secret combination thereof.

ID.—CONSTRUCTION OF POLICY—LIABILITY OF INSURER.—Before an insured is entitled to recover upon a policy of insurance it is essential that he bring himself within the express provisions of the policy. And while in the construction of such policies the rule is that doubtful provisions are to be construed in favor of the insured and in aid of his right to recover thereon, the rule is equally well established that where the terms of the policy are plain and explicit the court can indulge in no forced construction of the contract to cast a liability upon the insurance company which it has not assumed.

Id.—Attack on Finding for Insufficiency of Evidence.—A failure to object to evidence, or to move for a nonsuit, or to request specific findings, does not preclude an appellant from attacking a finding on the ground of insufficiency of the evidence to sustain it.

APPEAL from a judgment of the Superior Court of Los Angeles County. George H. Hutton, Judge.

The facts are stated in the opinion of the court.

John Murray Marshall, J. W. McKinley, and W. R. Millar, for Appellant.

Shankland & Chandler, for Respondent.

LORIGAN, J.—This action is brought to recover the sum of twenty thousand dollars on four burglary insurance policies of five thousand dollars each known as the "Peerless Bank Burglary Policy," issued in favor of the plaintiff and under which defendant agreed to indemnify the plaintiff from loss by burglary accomplished through entry into the bank safe of plaintiff "by the use of tools or explosives directly thereupon." In the complaint four causes of action against the defendant are stated, each counting on one of the policies issued. Each policy had attached to it a schedule showing the location and character of the vault within which the bank safe of plaintiff was constructed, the character of the safe itself—being burglar proof—and that within the safe (there was but one) was contained an inner steel burglar proof chest. The policies, each identical in terms and conditions were, with the schedules thereto attached, made by proper reference, and *in extenso*, parts of the complaint.

Each policy provided, considering its provisions solely with reference to a burglarious entry of safes, which is alone material here, that the defendant would indemnify the plaintiff "subject to the following special and general agreements which are to be construed co-ordinately, as conditions; Safe Burglary. A. For all loss by burglary of money, bullion, bank notes, . . . in consequence of the felonious abstraction of the same from the safe or safes described in the said schedule and located in the banking room also described in the said schedule . . . by any person or persons who shall make entry into

such safe or safes by the use of tools or explosives directly thereupon, in the sum of $5000. . . . Special Agreements. A. The company shall not be liable: (5) for loss of money, bullion, bank notes . . . from a combination fire and burglar proof safe or from a burglar proof safe containing an inner steel burglar proof chest, unless the same shall have been abstracted from the chest after entry also into the said chest effected by the use of tools or explosives directly thereupon."

The complaint in charging the liability of defendant in each of said counts under each policy, alleged that on the fourteenth day of December, 1908, "during the night of said day certain persons, to wit: George Allen Beatty, Ernest W. Sundin, ———Hatfield, and C. S. Martin, feloniously abstracted from the safes owned by said plaintiff, and described in the said schedule in said policy, and located in the banking room of plaintiff, . . . by making entry into such safes by the use of tools directly thereupon, the sum of $29,725.50."

No demurrer to the complaint was interposed by defendant. The answer denied that the persons mentioned in the complaint feloniously abstracted any sum of money from "the safe owned by plaintiff and described in any of the schedules in the policy set forth . . . or from any safe owned by plaintiff by making entry into such safe or any safe, in any manner whatsoever," or "that any person made entry into any of the safes or safes mentioned in plaintiff's complaint by the use of tools, or any tool, directly thereupon, or by the use of tools, or any tool, in any manner whatsoever." Certain special defenses arising under some of the provisions of the policy were set up,—namely, that C. S. Martin had been an employee of plaintiff in making repairs about the vault and safe of plaintiff and while so employed had acquired knowledge of the combinations of the vault and safe, had disarranged the time-lock and had concocted the burglary in conjunction with the others who were alleged in the complaint to have participated in it; also that the entry into the safe and abstraction of the money therefrom was wholly the result of the undue exposure of the safe on the part of plaintiff while Martin was employed in making the repairs upon it.

The cause was tried by the court. Its findings were against the special defenses interposed by defendant and also against it upon the main issue, the court, as to the latter, making two

findings: 1. That on the day named in the complaint Beatty, Sundin, and Hatfield feloniously abstracted the sum of $29,-725.50 from the "safe owned by plaintiff and described in the schedules in the burglar policies in controversy . . . by making entry into such safes by the use of tools directly thereupon, to wit, a screw-driver, a sledge hammer and a key"; the other that said money was feloniously abstracted by said persons "from said safes described in the schedules . . . by making entry into such safes by the use of tools directly thereupon, to wit,. by the use of" the same instrumentalities.

Judgment was entered in favor of plaintiff for $19,500.68, the court finding as the evidence showed, that subsequent to the burglary and before the trial of the action, the perpetrators above named were apprehended and money and property of the value exceeding ten thousand dollars were received from them and turned over to plaintiff.

No motion for a new trial was made by defendant but it appeals directly from the judgment on a bill of exceptions.

The principal grounds urged for a reversal are: 1. That the complaint fails to state a cause of action against the defendant; and 2. That the findings of the court that the safe, or safes, described in the schedules and covered by the policies was, or were, entered by the use of tools directly thereupon, is not sustained by the evidence.

As to the attack on the complaint. In this regard it is insisted that as, by the terms of the policies, the defendant could only be liable where tools were used not only on the safe itself, but upon the inner burglar proof chest contained in the safe, it was necessary, in order to state a cause of action against defendant, to allege facts showing that the entry into the safe and into the burglar proof chest in which the money was contained, was effected by the use of tools directly on the safe and directly upon the burglar proof chest; that the schedules attached to the policies show that there was but one safe and that it contained an inner burglar proof chest, and that an allegation that the "safes" of plaintiff were burglariously entered by the use of tools directly thereupon, is not an allegation that the chest was so entered.

We do not think this point well taken, or, at least, in the absence of any special demurrer to the complaint, that de-

fendant can be now permitted to make it.   The policies insured the plaintiff against burglary by entry into the safe and the burglar proof chest.   It is true that in the policies the safe and the inner burglar proof chest are mentioned as separate and distinct from each other, and in seeking to fix liability on defendant for a burglarious entry into the safe and chest it would have been more correct to describe the entry to have been made into the safe and chest, rather than to have described it as an entry into the "safes."   But as the policies covered an entry into both the safe and the chest, we do not think an allegation that the entry was made into the "safes" of the plaintiff was radically a failure to state a cause of action within the terms of the policy.   The complaint alleged the entry to have been made into the "safes" described in the policies and the answer referred to them in the same terms. The case was tried on the theory that the complaint sufficiently described the thing or things which were buglarized and for which plaintiff claimed defendant to be liable under the policies, and while to bring it exactly within the terms of the policies the complaint should have alleged the entry to have been made both into the safe and inner chest contained therein, still the failure to do so cannot, after trial and judgment, be made the basis of attack on the sufficiency of the complaint. The defendant should have taken advantage of this point by special demurrer for ambiguity or uncertainty.

The second point is on the sufficiency of the evidence to sustain the findings, that entry was made into the safe or safes of plaintiff described in the schedule and referred to in the policies by the use of tools directly thereupon.

There is practically no dispute as to how the burglary was effected.

The banking business of the plaintiff is conducted at Monrovia, Los Angeles County.   In June, 1908, the president of the bank entered into a contract with the Parcells Safe Company, engaged in the business of supplying safes, vault doors, and in doing bank contract work, to furnish vault lining, doors, and safes and properly install them on premises in Monrovia, to which the bank contemplated moving its banking business.   In consideration of this contract for the new work, the Parcells Safe Company agreed to do certain work about the vault and safe on the old bank premises—to make

certain repairs on the vault and safe doors, plumb them up and renovate and clean them generally, including the locks and bolts, and repaint the safe with aluminum.

The vault on the old premises was of brick with an outer vault door secured by a combination lock. Inside the vault was another door with a vestibule, or space, between it and the outer vault door, this second door opening with a key. The safe was inside the vault beyond this inner or vestibule door, and the door thereof was secured by a combination lock and a timelock. Inside the safe was an inner steel burglar proof chest in which the money of the bank was kept, and this was secured only by a combination lock. The safe and timelock were of a pattern in use a great many years ago.

The Parcells Company contracted with one Charles S. Martin, George A. Beatty, and E. W. Sundin to do the work of installing the vault and safes in the new bank building, and the renovating and repairing of the vault and the safe just described in the old one. Martin was a well known safe and vault expert, and the agent of the Parcells Company took him to the bank and introduced him to the president thereof as the man who would attend to the repairing, renovating, and cleaning of the vault and safe then in use by the bank. Martin went to work about the vault and safe and was engaged there during the banking hours from the 1st to the 10th of December, and performed for the Parcells Company the work which they had contracted with him to do. While so employed, his movements and work about the premises were supposed to be constantly under observation by some of the officers of the bank working in the banking room, and who had been instructed to make note of them. Beatty and Sundin at no time, until the night of the burglary, were upon the old bank premises. They were working, installing the vault and safe in the new bank premises. Notwithstanding the precautions taken by the bank officers to observe the movements of Martin, the latter while at work about the vault and safe and the locks and bolts connected therewith, secretly acquired knowledge of the combinations upon the doors of the vault and safe and the combination of the inner steel chest. He also, while cleaning up the timelocks and bolts on the inner side of the safe door, removed from the timelock a pin which he shortened and replaced. His object in shortening

the pin was so that a hook which is suspended from the pin while the timelock is running and in operation, could be jarred off the pin by heavy blows directed upon the outside of the safe door, thereby releasing the dogging or locking bar from the bolts of the safe and allowing the door thereof to be opened by the combination. Martin also fashioned a key whereby the inner vestibule door of the vault could be opened. Having acquired this information as to the combinations, and manipulated the timelock, Martin entered into an arrangement with Beatty and Sundin, who like himself had practical expert knowledge of the safe and lock business, and with another party named Edward Hatfield, to burglarize the bank. He furnished his associates with a card upon which he had written the combinations of the vault, safe, and inner chest doors, gave them the key to the vestibule door, and instructed them how the timelock had been manipulated by him so that it could be rendered ineffective by the use of a hammer. Supplied with this information, on the night of December 14, 1908, Beatty, Sundin, and Hatfield proceeded from Los Angeles to Monrovia to carry out their scheme of robbing the bank. Martin did not accompany them, having left several days previously for Ventura, so as to be able to prove an alibi should suspicion be directed to him on account of his recent employment about the bank premises. Reaching Monrovia Beatty effected an entrance to the bank premises through a window, carrying with him a bag, containing a screw-driver, plyers, other small tools, and two heavy hammers. He alone entered the bank premises and alone actually perpetrated the burglary. With the combinations furnished by Martin he readily opened the vault door, entered and turned on the electric light in the vault. He then, for the purpose of preventing any one from entering the vault while he was at work, changed the combination on the vault door and locked it. He opened the inner vestibule door with the proper key therefor, which he found hanging up within the vault. He then tried the combination on the safe door but was unable, as he testified, to open it on account of the timelock being set, and then proceeded to operate, as directed by Martin, on the timelock. He struck the handle of the doors several times with a large hammer, but noticing that the handle was being slightly bent without producing any effect upon the timelock,

he ceased his attack at this point. He was desirous of accomplishing the burglary without, if possible, leaving any indications or marks of how it was effected. Observing several depositor passbooks in the vault, he took one and placed it over a point opposite the timelock-dial, struck several blows upon it with the hammer, with the result that the hook on the timelock was jarred off the pin which held it in position, and which had been manipulated by Martin so that this might be accomplished. The bolts being thus released from the operation of the timelock, he then worked the combination and opened the safe door, which brought him into the presence of the inner steel burglar proof chest, containing the money of the bank. This was secured by a combination lock only, which Beatty readily worked from the information of the combinations furnished by Martin, opened the chest, took out the money deposited therein—$29,725.50—and placed it in his toolbag. Beatty had been directed by Martin, after he had secured the money from the inner chest, to readjust the timelock and put it in running condition, so that suspicion might be cast on some of the employees of the bank familiar with the various combinations thereof, that they had abstracted the money. Beatty unfastened the rim of the timelock and proceeded to do this, but while doing so, as he testified, his conscience revolted against throwing the blame on some innocent man, so that while he readjusted the hook and left the timelock in apparent proper condition, he, however, effectually disarranged another portion of its mechanism so as to indicate to any expert safe and lock man, who might be called in to examine the timelock, that the job had been done by some one familiar with safes and locks. Having so adjusted the timelock from the inside, Beatty shut the burglar proof chest from which he had taken the money and locked it. He locked also the safe door, and having readjusted the original combination on the vault door, which he had changed when he first entered the vault, went out and locked that also. Leaving the bank premises, Beatty and his companions returned to Los Angeles. The money was divided equally between the four participants in the burglary—Martin subsequently receiving his share—and Beatty, Sundin, and Hatfield immediately left Los Angeles for other localities. The officials of the bank the next morning discovered that the money of

the bank had been abstracted from the inner chest but were unable to ascertain how it had been accomplished. Some days afterward an expert safe and locksmith, who was called in to examine the safes and the timelock, discovered that the time-lock had been tampered with, but no definite information upon the subject of who tampered with it or why it was done was obtained until after the arrest of Beatty, Sundin, and Martin. It does not appear what became of Hatfield. Beatty, Sundin, and Martin were convicted and sentenced to terms in the state prison. After their arrest and before conviction Beatty confessed to his participation in the burglary and the respective parts therein taken by Martin and his other associates, and pointed out and demonstrated to the authorities and the officers of the bank how the timelock had been fixed by Martin and operated on by him in securing an entrance to the safe. He and Sundin were also witnesses on behalf of plaintiff to the same effect on the trial of this cause, and the details of the burglary are recited here from their testimony, which was the only direct evidence on the subject.

In addition to the above there is evidence that when some safe and lock experts examined the safe and timelock and the inner burglar proof chest after the burglary had been committed, one of them discovered inside of the burglar proof chest some marks like file marks—two of them—from which one would be enabled to line up the dial on the inside of the chest.

This being the evidence in the case, it is insisted by appellant that the findings of the court that the safes of plaintiff mentioned in the schedules and referred to in the policies were entered by the use of tools directly thereupon (considering the safe proper and the inner steel burglar proof chest as embraced within the descriptive term "safes" mentioned in the findings) is not sustained by the evidence, because the evidence all shows that entry into the inner steel burglar proof chest was not effected by the use of tools directly thereupon, but solely by the use and operation of the secret combination thereof.

We think this point is clearly well taken.

Before one is entitled to recover upon a policy of insurance it is essential that he bring himself within the express provisions of the policy. While in the construction of insurance policies the rule is that doubtful provisions are to be

construed in favor of the insured and in aid of his right to recover thereon, the rule is equally well established that where the terms of the policy are plain and explicit the court can indulge in no forced construction of the contract to cast a liability upon the insurance company which it has not assumed. The policies which were issued to the plaintiff were not general policies against burglary, but against burglary committed by the use of tools or explosives, not only upon the safe itself, but if it contained an inner burglar proof chest, by the use of tools also upon such chest. There can be no question of this, as the policies clearly so declare. Now as the policies and schedules attached to the complaint show that there was an inner steel burglar proof chest within the safe, it was necessary for the plaintiff, before it could fix any liability on the defendant under the plain terms of the policies, to show that the entry was made not only into the safe itself, but also into the inner burglar proof chest, from which the money was taken, by the use of tools or explosives directly upon that chest. This the evidence not only fails to show, but, on the contrary, it is clearly shown that the entrance to the inner steel chest was effected by Beatty solely by the use of the combination thereof which had been furnished him by Martin. But the risk assumed by the appellant was not for loss sustained through use of the secret combination on the safes or chest of the insured, whether it was by somebody connected with the business of the insured, or surreptitiously and secretly acquired and used by some one unconnected therewith. The policies are burglary policies—so specifically designated —and when, under them, the respondent assumed risk for an entry made, not only into the safe but also into the inner chest, by means of tools or explosives directly thereupon, it meant an entry effected by the employment of violence—the use of burglar's tools or explosives, such as are employed by burglars to force an entrance into safes and chests of the character described in the policies. The risk which the insurance company assumed was not against burglary however accomplished, but only against burglary by the use of tools or explosives. It may, of course, be conceded that the entry into the safe itself was effected partially by the use of the hammer operating to disarrange the timelock after it had been adjusted by Martin so that this might be accomplished, and part-

ly by the use of the combination which could be used after
the timelock had become ineffective. And, for present pur-
poses, it may be conceded that the entry into the safe was
made by the use of tools directly upon the safe. But to
make the defendant liable under the provisions of the policy
it was incumbent on plaintiff to prove that not only was entry
made into the safe by use of tools, but that tools were used
directly upon the inner chest itself. Now there is not a parti-
cle of evidence that any tools were used to effect an entrance
into the chest itself, as the only witness who testified as to
the method employed to open it was Beatty, and his evidence
is that he opened it by using the combination, knowledge of
which Martin had secretly secured and furnished him. His
testimony shows clearly and absolutely that no tools were
used by him upon the chest at all. This being true, when
the court found that the safes mentioned in the policies and
schedules—including the safe proper and chest under the
comprehensive term "safes"—were entered by the use of tools
used directly thereon, to wit: a screw-driver, key, and sledge
hammer, it made a finding having no sufficient support in the
evidence whatever as far as the entry into the inner chest was
concerned, and as the liability of the defendant was not only
for an entry into the safe by such means, but also into the
inner chest by the same means, and the entry of the latter
was not so accomplished, no liability of the defendant under
the terms of the policies attached, and the court undertook
to fix by its findings a responsibility when the evidence showed
that none had been proven.

Counsel for respondent recognizing, as they clearly must,
that no liability could be cast on the appellant under the terms
of the policies unless the evidence showed that an entrance
was effected not only into the safe itself, but also into the
inner burglar proof chest as well, by means of tools used
to effect an entrance into both, assert that there was in fact
evidence in the case of the use of tools upon the inner chest.
This claim is based on the evidence of the expert heretofore
referred to, called by the respondent after the burglary had
been committed to ascertain how it had been accomplished.
This witness, testifying generally in the case as to his exam-
ination of the safes and the locks and inner chest, stated that
he had discovered on the inside of the inner steel chest some

marks made by a file, or some other instrument, which would enable a person to line up the dial on the inside of the chest. This, respondent claims, sufficiently shows that entry was accomplished into the chest by the use of tools directly thereon. But it shows nothing of the kind. The instrument with which these marks were made on the chest may have been a tool, and if a file it was, of course, one, but it was not a tool through the direct use of which entry into the inner chest was effected. Nor does the testimony of the expert indicate that the entry into the chest was effected by means of these tool marks, because they were on the "inside of the chest," and could afford no advantage to one operating upon the chest when locked by the combination. Aside from this, there is not a particle of evidence of any one as to when or by whom these marks were made, or that an entrance into the chest was effected by the use of the tool with which they were made. There is nothing to show that any tool was used, or that the marks were made by Martin or Beatty, or that they were made or used in connection with the burglary. How the entrance into the chest was effected is not at all in dispute. Martin gave Beatty the combination to the chest on a card, and Beatty testified that in opening the chest he used the combination that Martin had furnished him.

It is insisted, however, by respondent that appellant is estopped from here asserting that the evidence is insufficient to support the findings that the safes described in the policies and schedules were entered by the use of tools directly thereupon as far as the findings are addressed to an entrance into the inner steel chest as one of the safes referred to in the findings. In this regard it is insisted that no objections were made on the trial to evidence offered to show entry into the "safe" or "safes"; no motion for a nonsuit on the ground that the entry into the chest was the vital issue; that no finding was asked for by appellant to distinguish between a safe and an inner chest; that the pleadings on both sides described the things burglarized as "safes," and the case was tried on the theory that the burglary of the safe was a burglary of each and all of its parts, one of which was the inner chest.

We perceive no merit in this claim. It would be idle to attempt to elaborate the proposition that a failure to object

to evidence, or to move for a nonsuit, or request specific findings, precludes an appellant from attacking a finding on the ground of insufficiency of the evidence to sustain it.

As to the issues made by the pleadings and the theory upon which the case was tried, the claim of respondent is equally without merit.  While we have held that the complaint in charging a burglary of the safes mentioned in the schedules and policies sufficiently stated a cause of action to defeat an objection to its sufficiency as a pleading, made for the first time on this appeal, this did not obviate the necessity of the respondent proving a case on the trial, bringing the liability of the appellant within the clear terms of the policy as set forth in the complaint—showing an entry into both the safe and the inner chest by the use of tools directly upon both.

Nor was the case tried on the theory that the burglary of the safe and the burglary of the inner chest was one and the same thing and equally within either one of the clauses of the policy.  In making its case, respondent proved by the same witness—Beatty, who was the only witness detailing the circumstances of the burglary—how and by what means entrance into the vault, safe, and inner chest was effected.  The appellant did not question the accuracy of the testimony of Beatty as to how he effected an entry into the vault or inner chest. Entry into the vault was not covered by the policies, and entry into the inner chest was shown by the testimony of Beatty not to have been made in a manner which would make the appellant liable under the policies.  It is true that appellant undertook to prove that the timelock on the safe had been so tampered with before the night of the burglary as to render it wholly inefficient as a timelock, but in a different manner than as stated by Beatty; that the dogging or locking bar operated by it did not work on that night so as to lock the safe at all; that the safe was only in fact locked by the combination, and that Beatty's statement of the use of a hammer to disarrange the hook on the pin, thereby releasing the locking bar and permitting the opening of the safe by the combination, was untrue, and that he in fact opened it by the use of the combination alone.  But the fact that appellant questioned or disputed the method by which Beatty effected an entrance to the safe, in an effort to show that even his entry into the safe itself was not effected by the means designated

in the policies, did not preclude the defendant from insisting that even if entry into the safe itself was effected by the use of tools, still, as appellant only assumed the risk of the loss of money abstracted from the inner steel burglar proof chest contained within the safe "after entry into such chest effected by the use of tools directly thereupon," that as the entry into the chest was not effected by that means, no liability against appellant was shown, nor was it precluded from attacking a finding casting such liability on it when there was no evidence whatever to support it.

The judgment appealed from is reversed.

Melvin, J., and Henshaw, J., concurred.

Hearing in Bank denied.